IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-60252
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RANSEL D. SPARKS,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Mississippi
(1:94-CR-31-D)
_____
April 18, 1996

Before REAVLEY, GARWOOD, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

Ransel Sparks ("Sparks") was convicted by a jury of conspiracy, mail fraud, and interstate transportation of falsely made and counterfeited securities, all in relation to his involvement in and direction of an automobile odometer "rollback" scheme. He appeals both his convictions and sentences, contending that (1) the United States (the "government") failed to prove the necessary elements of mail fraud, (2) the court allowed the government to introduce inadmissible evidence, and (3) the court erred in its computation of his sentence. Although Sparks ably

_____

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

presented cogent arguments on all three points, both in his brief and at oral argument, we nevertheless find no error in the proceedings in the district court. We therefore affirm the judgment from which Sparks appeals.

I

In 1986, Hollis Sparks, the defendant's cousin, incorporated a used car dealership in Belmont, Mississippi, under the name of "Sparky, Inc." However, the defendant, Ransel Sparks, was responsible for the day-to-day management of the business, and in 1990, Hollis transferred half of the corporation to the defendant. Between 1986 and 1991, Ransel Sparks (hereinafter referred to as "Sparks") purchased late-model, high-mileage cars at auto auctions. He transferred the cars to local dealers, who, as co-conspirators, would "roll back" the odometers and sell the cars. The dealers sold the cars at a minimum price set by Sparks, with any amount received over that minimum serving as the dealers' compensation.

The odometer rollback was disguised through the use of replacement titles that Sparks obtained, taking information from the previous titles on the same cars, transposing the information on replacement titles, and forging signatures of previous owners. When one of the dealers working for Sparks sold a rollback car, Sparks would transfer the original title and an odometer statement to the dealer, which the dealer would sign. The title reflected that the car had been sold by Sparky, Inc. to the dealer at its true high mileage. Sparky, Inc. kept copies of these titles in its

files, so that Sparks could claim that he had no knowledge that the odometers were being rolled back by the dealers. "Clean" titles, reflecting the low miles after the rollback, were then provided by Sparks to the dealers for their customers. The dealers would make entries on these titles indicating that they had purchased the car from its original owner, thereby omitting Sparky, Inc. from the chain of title.

In 1994, a grand jury returned an indictment against Sparks, his cousin, and four car dealers. The indictment charged the defendants with one count of conspiracy to commit mail fraud, odometer tampering, and interstate transportation of falsely made and counterfeited securities (18 U.S.C. § 371); three counts of mail fraud (18 U.S.C. § 1341); seventeen counts of odometer tampering (15 U.S.C. §§ 1984 and 1990(c)); and seventeen counts of interstate transportation of falsely made and counterfeited securities (18 U.S.C. § 2314). Sparks was convicted and sentenced on the conspiracy count, three mail fraud counts, and thirteen of the seventeen interstate transportation counts. He was acquitted on all of the odometer tampering counts. This appeal followed.

II

A

Sparks first contends that the evidence was insufficient to support his conviction on the three mail fraud counts. A conviction under the mail fraud statute requires proof of a scheme to defraud, and proof that the defendant caused the mails to be

used for purposes of executing the scheme. <u>United States v. Scurlock</u>, 52 F.3d 531, 537 (5th Cir. 1995) (citing <u>United States v. Duncan</u>, 919 F.2d 981 (5th Cir. 1990), <u>cert.</u> <u>denied</u>, 500 U.S. 926, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991)). Sparks' conviction on the three mail fraud counts was based on the mailing of three legitimate title certificates from Nashville Auto Auction to Sparky, Inc. Sparks argues that the government failed to introduce sufficient evidence that: (1) the three titles in question were actually mailed; (2) Sparks caused the titles to be mailed; and (3) the mailings were sufficiently related to the alleged scheme to defraud.

Our examination of the cases demonstrates that the evidence was sufficient to support the jury's finding of mail fraud. The government presented the testimony of the director of corporate security officer of the company that owns the Nashville Auto Auction. His testimony established that it was the regular business practice of the Auto Auction, when the title was not available for immediate transfer to a purchaser, to send the title, through the mail, to the buyer of the car. This evidence, when viewed in conjunction with the documentary evidence found at the defendant's place of business,[1] was sufficient to permit a reasonable trier of fact to find that the necessary element of use

---

[1]The government produced the bills of sale for the three vehicles that related to the mail fraud counts. Each bore the notation that the title was "to be mailed."

of the mails had been established.  See United States v. Goss, 650 F.2d 1336, 1343 (5th Cir. 1981) (holding that "[c]ircumstantial evidence suffices to establish the mailing element of the offense and direct proof of mailing is not required.  Proof of the use of the mails may be made out by substantiating a regular business practice of mailing the type of document by which the fraudulent scheme was perpetrated.")

Sparks also argues that the evidence was insufficient to show that **he** caused the mails to be used.  We reject this contention. Sparks' signature appeared on the bills of sale immediately below the notation "title to be mailed," a fact from which the jury reasonably could have inferred that the use of the mails was foreseeable to Sparks.  Furthermore, given the evidence of Sparks' experience in purchasing cars at auction, his extensive dealings with the Auto Auction in particular, and the Auto Auction's regular practice of mailing titles when they were not available at the time of vehicle purchase, the jury could rationally conclude that Sparks knew that the mails would be used to forward the title certificates to him whenever he did not pick them up personally.  See United States v. McLelland, 868 F.2d 704, 707 (5th Cir. 1989) (holding that accused causes letter to be delivered by mail if he acts with knowledge that use of mails will follow in ordinary course of business, or where he can reasonably foresee that use of mails will result).

Finally, Sparks contends that the mail fraud convictions should be set aside because the evidence failed to prove that the three mailings were made in furtherance of the scheme to defraud. He argues that the mailings of the legitimate original titles to the three vehicles did not satisfy the mailing requirement because the mailings were "intrinsically innocent." The Supreme Court has rejected a nearly identical argument. In Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Court wrote:

> To the extent Schmuck would draw from these previous cases a general rule that routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense, he misapprehends this Court's precedents. In Parr the Court specifically acknowledged that "innocent" mailings--ones that contain no false information--may supply the mailing element. In other cases, the Court has found the elements of mail fraud to be satisfied where the mailings have been routine.

Schmuck, 109 S.Ct. at 1450.

Consistent with the government's proof, rational jurors could have concluded that the alleged "innocent mailings" actually were necessary to Sparks' scheme because the "clean" titles insulated him from the sales of the "rolled-back" cars. Moreover, the government contends--and we agree--that rational jurors could have concluded that it was necessary for Sparks to have these original titles so that he could obtain the information from them, which was necessary in order to acquire the replacement titles, which were used to further the scheme. The evidence, therefore, was sufficient to support Sparks' mail fraud convictions.

-6-

Sparks asserts next that the government failed to lay an adequate foundation--because of the inadequacy of its witness--for the admission of certain documents under the business records exception to the hearsay rule, Federal Rule of Evidence 803(6). To the contrary, we find that the government's witness on this issue, Edward Tucker, was a "qualified witness" within the meaning of Rule 803(6). "A qualified witness is one who can explain the record-keeping system of the organization and vouch that the requirements of Rule 803(6) are met." United States v. Iredia, 866 F.2d 114, 120 (5th Cir.), cert. denied, 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989). "[I]t is not necessary that a sponsoring witness be employed by the business at the time of the making of each record. The witness must only be in a position to attest to its authenticity." United States v. Evans, 572 F.2d 455, 490 (5th Cir.), cert. denied, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).

Tucker testified that, although he had worked for Sparks only since 1991, he had become familiar with the manner in which Sparky, Inc. maintained its records. He testified that the files were assembled and that the entries were made at or near the time of the events described therein and that the records in the files were maintained in the ordinary course of Sparky, Inc.'s business. Tucker also testified that when he examined files that were assembled before his arrival at Sparky, Inc., he found that they

contained the same types of information as those prepared after he arrived. Tucker was thus a "qualified witness" within the meaning of Rule 803(6), and Sparks' appeal on this issue therefore is without merit.[2]

C

Finally, Sparky appeals the sentence imposed by the district court. He argues that the district court erred in (1) considering as "relevant conduct" some 362 additional rollbacks not charged in the indictment, and (2) valuing the amount of loss attributable to Sparks.

(1)

Under United States Sentencing Guidelines ("U.S.S.G.") § 1B1.3, the sentencing court may properly consider "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The district court's factual findings regarding a defendant's relevant conduct for purposes of sentencing are reviewable only for clear error. United States v. McCaskey, 9 F.3d 368, 372 (5th Cir. 1993), cert. denied,

---

[2]We also reject Sparks' assertion that Tucker's testimony was inadequate to authenticate those documents in Sparky, Inc.'s files that were prepared by entities other than Sparky, Inc. There is no requirement under Rule 803(6) that the records must be prepared by the custodian of the records in order for them to be admissible. Furthermore, we have previously held that "records transmitted by persons with knowledge and then confirmed and used in the regular course of the dealership's business" are admissible as business records under Rule 803(6). United States v. Ulrich, 580 F.2d 765, 771 (5th Cir. 1978).

114 S.Ct. 1565 (1994).  The district court's factual findings in support of its sentencing determination must be established by a preponderance of the evidence.  Id.

The relevant conduct at issue is rolling back the odometers of 362 additional vehicles that were not charged in the indictment by the dealers with whom Sparky, Inc. dealt.[3]  Because the number exceeds the number of cars charged in the conspiracy indictment by over 300 cars, and because he was acquitted of the specific rollback charges, Sparks objects to charging these rollbacks as relevant conduct in the computation of his sentence.  We have reviewed the sentencing transcript and PSR, and find no clear error in the district court's conclusion that all the charged rolled back vehicles constituted relevant conduct for which Sparks may be appropriately held accountable.  Section 1B1.3(a)(1)(B) provides that in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy) all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to

---

[3]The PSR found that 381 rollbacks were reasonably foreseeable to Sparks.  This represents nineteen of the twenty-three vehicles charged in the indictment, along with 362 additional vehicles whose odometers were allegedly tampered with by the local dealers working with Sparks.  Four of the twenty-three vehicles charged in the indictment were excluded from this number by the government.

avoid detection or responsibility for that offense, are to be considered in determining the offense level.  Under this standard, the district court had adequate evidence to conclude that Sparks should be held accountable for the 362 additional vehicles.

(2)

Finally, we reject Sparks' contention that the district court erred in its valuation of the amount of victim loss attributable to Sparks under U.S.S.G. section 2F1.1(b).  The district court chose to assess the injury under the Guidelines[4] based upon figures found in a wholesale price guide known as the Galves Auto Price List. That manual indicates that the wholesale value of a car decreased by $85 for every 1,000 miles that the odometer was rolled back. Sparks argues that the court instead should have utilized the N.A.D.A. Retail Price Guide, commonly used in retail valuation of used cars.  The N.A.D.A. Guide suggests that, when accepting a trade-in of a high-mileage vehicle, a dealer should decrease the credit to the consumer by an amount contained in a table in the book, but never by more than forty percent of the book's suggested trade-in price--notwithstanding rollbacks or unknown mileages.

A district court's finding as to the amount of loss caused by a defendant's conduct is reviewable only for clear error.  United

_____

[4]The parties agree that, under the Guidelines, the district court was required to estimate the injury to consumers resulting from Sparks' scheme as measured by the difference between what they paid for their cars and what they could receive when selling the vehicles with the disclosure that the cars were rollbacks.  See U.S.S.G., comment n.7(a).

<u>States v. Hill</u>, 42 F.3d 914, 919 (5th Cir.), <u>cert.</u> <u>denied</u>, 116 S.Ct. 130, 113 L.Ed.2d 79 (1995).  At the sentencing hearing, the government introduced the testimony of a used car manager at a Memphis dealership, who indicated that he would never rely on the retail price guide to establish the value of rolled back vehicles, because they could not be sold on the retail market.  The Guidelines provide that the district court "need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 comment n.8.  We cannot say that the calculations and loss figures utilized by the district court were clearly erroneous.[5]

### III

We AFFIRM the defendant's conviction and sentence.

A F F I R M E D.

---

[5]We reject Sparks' argument that <u>United States v. Whitlow</u>, 979 F.2d 1008, 1012 (5th Cir. 1992), compels a different result.  In that case we held that a valuation loss based upon the <u>N.A.D.A. Guide</u> was not clearly erroneous.  We did <u>not</u> hold that the <u>N.A.D.A. Guide</u> was the only source upon which the district court could base its valuation of loss.