FILED
United States Court of Appeals
Tenth Circuit

April 3, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

GARY LEE SUTTON,

        Defendant - Appellant.

No. 07-1223

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 06-cr-00124-EWN)**

Jill Wichlens, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, on the briefs), Denver, Colorado, for Defendant - Appellant.

Alan J. Phelps, Trial Attorney, Office of Consumer Litigation, U.S. Department of Justice (Peter D. Keisler, Assistant Attorney General, Troy EID, United States Attorney, Kenneth L. Jost, Deputy Director, on the brief), Washington, D.C., for Plaintiff - Appellee.

Before **TACHA**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **KELLY**, Circuit Judge.

**KELLY**, Circuit Judge.

Defendant-Appellant Gary Lee Sutton pleaded guilty to one count of mail fraud in violation of 18 U.S.C. §§ 1341, 2 (count 1) and one count of odometer tampering in violation of 49 U.S.C. §§ 32703(2) and 32709(b) and 18 U.S.C. § 2 (count 11). The district court sentenced Mr. Sutton to 30 months' imprisonment on each count, to be served concurrently, and three years' supervised release. On appeal, Mr. Sutton challenges the district court's application of a 12-level enhancement pursuant to § 2B1.1(b)(1)(G) of the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") (2001), which was based upon the court's finding that Mr. Sutton's conduct caused a loss of $304,000. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and affirm.

Background

Between 1997 and 2003, Mr. Sutton, a wholesale automobile dealer in the Denver, Colorado area, purchased 76 "high-mileage" vehicles at auction and subsequently "rolled back" the odometers in these vehicles so that they displayed false, lower mileage figures. Mr. Sutton then took a number of steps to conceal his actions. First, he obtained duplicate titles from the State of Colorado by using forged odometer disclosure statements and claiming that private parties sold the vehicles directly to him. On the back of these duplicate titles, Mr. Sutton wrote the untrue, lower mileages and false dealership transfers. He also submitted "Statement of Fact" forms to the State of Colorado that stated that the odometers

2

of the vehicles he had purchased were not functional and had been replaced with working odometers that displayed mileages lower than the vehicles' actual mileages. Based on this information, the State of Colorado issued new titles that reflected the lower mileages along with the letter "N," which indicated that the mileages were "not actual." On the back of these new titles, Mr. Sutton wrote that the vehicles had been sold to other dealerships and that the mileages displayed on the odometers were the actual mileages.

Mr. Sutton then used these Colorado titles to obtain new Arizona titles in his own name at an Arizona address. He mailed the applications for new Arizona titles along with the Colorado titles to a private title service in Phoenix, Arizona, claiming on the applications that the Colorado titles displayed "actual mileage." He instructed the Arizona title service to send via a commercial interstate carrier the new Arizona titles to him in Colorado. After receiving the new Arizona titles, Mr. Sutton sold the vehicles in Colorado, representing to buyers that the mileage appearing on the vehicles' odometers and accompanying Arizona titles were accurate.

Following Mr. Sutton's guilty plea, a presentence investigation report was prepared ("PSR"). The PSR calculated a total offense level of 19, placed Mr. Sutton in a criminal history category of I, and calculated an advisory guidelines

3

range of 30 to 37 months.[1]  In his plea agreement, Mr. Sutton stipulated that he fraudulently sold at least 76 vehicles with rolled-back odometers and that the loss should be calculated by multiplying the number of fraudulently sold vehicles by an estimate of the average loss per vehicle.  See I. R. Doc. 21 at 6, 7; U.S.S.G. §§ 1B1.3, 2B1.1(b)(1), cmt. n.2(C).  For a violation of 49 U.S.C. §§ 32703 and 32709(b) that involves more than one vehicle, as in this case, § 2B1.1 of the Guidelines applies.  See U.S.S.G. § 2N3.1(b)(1).  The PSR included a 12-level enhancement, finding that Mr. Sutton's conduct caused a loss of more than $200,000.  See U.S.S.G. § 2B1.1(b)(1)(G).

Relying on the government's sentencing memorandum, the PSR concluded that the loss was $4,000 per vehicle, totaling $304,000 for all 76 vehicles Mr. Sutton fraudulently sold.  The government's per vehicle loss estimate represented approximately 40% of $9,971, the average purchase price based upon sales data for 46 of the 76 vehicles.  I. R. Doc. 25 at 6 & Ex. C at 2.  The government maintained that this estimate was conservative because the results of a study commissioned by the United States Department of Transportation determined that

_____

[1]  Utilizing the grouping rules, the PSR used U.S.S.G. § 2B1.1 to calculate the offense level, beginning with a base offense level of 6, adding 12 levels for a loss in excess of $200,000, adding 4 levels for 50 or more victims, and finally subtracting three levels for acceptance of responsibility.  U.S.S.G. §§ 2B1.1(b)(1)(G), (b)(2)(B); 3E1.1(b).

the proper measure of damages in odometer fraud was often the entire price paid for the vehicle.  See I. R. Doc. 25 at 5-6.

Mr. Sutton objected to the PSR's loss calculation and advocated for an alternate calculation.  To estimate the loss, Mr. Sutton first determined the actual mileage of 54 of the 76 vehicles prior to the roll-back of their odometers using sales records from when he purchased the vehicles.  Then, using information from the National Association of Automotive Dealers ("NADA") website, he determined the value of each vehicle that corresponded to its actual mileage and compared that amount to the purchase price paid by each victim.  Using this method, he calculated the average loss for each of the 54 vehicles to be $1,107.80 and then multiplied this figure by the 76 vehicles he sold to arrive at a total loss of $84,192.80.  A loss of $84,192.80 corresponds to an 8-level enhancement, see U.S.S.G. § 2B1.1(b)(1)(E), which if applied would reduce Mr. Sutton's total offense level to 15 and reduce his Guidelines range to 18 to 24 months.

The government argued that Mr. Sutton underestimated the loss and his reliance on the NADA website was flawed.  To support its position, the government submitted a declaration by Mr. Richard Diklich, an instructor of automotive technology at Longview Community College in Lee's Summit, Missouri, and an expert on valuation issues related to vehicle title problems.  I. R. Doc. 25, Ex. B at 1.  Mr. Diklich explained that "[a] vehicle with a Not Actual Mileage title does not have the same value in the marketplace as does a vehicle

5

with the same odometer reading and a clean title. The diminution in value in most cases will be 40% to 50% of fair market value." Id. at 2. According to Mr. Diklich, there are a number of reasons why this is true, including 1) dealers often refuse to accept such vehicles as a trade-in or at a minimum offer consumers a steep discount; 2) financial institutions are unlikely to finance the purchase of such vehicles; 3) extended service companies will not provide coverage on such vehicles; 4) most manufacturers will not honor warranty claims on such vehicles; 5) insurance companies will not pay out full value on a total loss settlement for such vehicles; and 6) states and counties may incorrectly value such vehicles and collect artificially excessive taxes on them. Id. at 3-4. Mr. Diklich also stated that it is inappropriate to use the NADA guide or another comparable guide, such as the Kelley Blue Book, to value a vehicle with a rolled-back odometer because such guides do not factor in the effect a "Not Actual Mileage" title has on the vehicle's market value. Id. at 2-3. This conclusion was supported by the declarations of Patricia Erney, the Managing Editor of the NADA guide, see I. R. Doc. 25, Ex. D at 1-2, and Charles Vogelheim, the Editor of the Kelley Blue Book, see I. R. Doc. 25, Ex. E at 1-2.

The probation officer ultimately declined to take a position on the amount of loss caused by Mr. Sutton's conduct and stated that the issue would be more appropriately resolved by the district court. At sentencing, the district court agreed with the government's loss calculation. The court was particularly

6

persuaded by the declaration of Mr. Diklich and concluded that his statements provided a basis for finding the government's estimate of the loss to be reasonable. II. R. at 9-12. Mr. Sutton appeals this factual finding.

<u>Discussion</u>

Post-<u>Booker</u>, we review sentences for reasonableness under an abuse of discretion standard. <u>Gall v. United States</u>, 128 S. Ct. 586, 594 (2007). Reasonableness includes a procedural component, which includes how the sentence was calculated, and substantive component concerning the length of the sentence actually imposed. <u>United States v. Smart</u>, — F.3d —, No. 06-6120, 2008 WL 570804, *2 (10th Cir. Mar. 4, 2008). Relevant here, procedural reasonableness addresses whether the district court correctly calculated the advisory Guidelines range and whether the facts relied on were adequately supported, i.e. not clearly erroneous. <u>Gall</u>, 128 S. Ct. at 597; <u>United States v. Tindall</u>, — F.3d —, No. 07-8038, 2008 WL 554821, *5 (10th Cir. Mar. 3, 2008). If the district court correctly calculates the Guidelines range based upon the facts and imposes sentence within that range, the sentence is entitled to a presumption of reasonableness. <u>Rita v. United States</u>, 127 S. Ct. 2456, 2462-63 (2007).

The only issue on appeal concerns the loss caused by Mr. Sutton's conduct. Specifically, Mr. Sutton challenges only the court's finding that the average loss per vehicle was $4,000, or roughly 40% of the average purchase price paid by

7

each victim. He does not dispute that the total loss should be calculated by multiplying the average loss per vehicle by the 76 vehicles he fraudulently sold. A challenge to a district court's § 2B1.1(b)(1) loss calculation, such as the one made here, is a factual question that we review for clear error. United States v. Leach, 417 F.3d 1099, 1105 n.8 (10th Cir. 2005); United States v. Berndt, 86 F.3d 803, 811 (8th Cir. 1996). In conducting our review, we recognize that the government has the burden of proving loss by a preponderance of the evidence, United States v. Schild, 269 F.3d 1198, 1200 (10th Cir. 2001), and we afford the district court's determination "appropriate deference" because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." U.S.S.G. § 2B1.1(b)(1), cmt. n.2(C) (citing 18 U.S.C. § 3742(e) and (f)). This deference is applied even where the district court's decision is based on documentary evidence. See Anderson v. Bessemer City, N.C., 470 U.S. 564, 574 (1985).

A district court "need only make a reasonable estimate of the loss." Id. § 2B1.1(b)(1), cmt. n.2(C). The loss estimate must "be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he fair market value of the property unlawfully taken . . . [and] [t]he approximate number of victims multiplied by the average loss to each victim." Id. Here, the district court did exactly that to arrive at a reasonable estimate of the loss. We agree with the district court that Mr.

Diklich's declaration provided a reasonable basis for estimating the loss at 40% of the average purchase price. We also find that the statements by Mr. Diklich, Ms. Erney and Mr. Vogelheim support the district court's conclusion that Mr. Sutton's reliance on the NADA website was inherently flawed and caused him to underestimate the loss.

Mr. Sutton argues that the district court's estimate was flawed for three reasons. First, he claims that the district court artificially inflated the loss because the court factored both high mileage and unanticipated repair costs into the loss. He argues this was flawed because mileage is a proxy for anticipated repair costs and thus the court double-counted loss by considering repair costs in addition to high mileage. Mr. Sutton obfuscates the court's reasoning. The court did not add loss attributable to high mileage to loss attributable to repair costs. The court simply adopted the 40% estimate as a measure of loss that takes into account all of the reasons (including unanticipated repair costs) why vehicles with rolled-back odometers are worth less than comparable vehicles with accurate odometers. Further, Mr. Diklich's statements indicate that repair costs in vehicles with rolled-back odometers may in fact be higher than repair costs in comparable vehicles with accurate odometers because extended service companies do not provide coverage on such vehicles and most manufacturers do not honor warranty claims on such vehicles. I. R. Doc. 25, Ex. B at 3-4.

9

Second, Mr. Sutton claims that the court erroneously assumed that the true mileage figures of the vehicles he sold were unknown because the government was able to ascertain the actual mileage figures from the vehicles. His argument is not persuasive. The district court did not base its loss calculation on the contention that the mileage figures were unascertainable. Rather, the court based its 40% loss estimate on how the market values a vehicle that has a rolled-back odometer.

Finally, he argues that the district court only considered the resale values of the vehicles, not their "inherent value" as an "instrument of transportation." Aplt. Br. at 34. Mr. Sutton offers no estimate of what the inherent value of these vehicles might be, but suggests that a vehicle's value depends in part on how the owner intends to use it. According to Mr. Sutton, if an owner intends to "drive [the vehicle] into the ground" its resale value is of no significance to determining loss. Id. While that may be, the Guidelines provide for measuring loss based upon fair market value and that is precisely what the court did in this case. U.S.S.G. § 2B1.1(b)(1), cmt. n.2(C). In any event, by relying on the NADA guide, Mr. Sutton himself values the loss based upon resale value.

Recognizing that we have not previously had occasion to rule on this issue, Mr. Sutton also argues that the district court's decision runs counter to relevant decisions from other courts that have expressly done so. Mr. Sutton's argument is overstated. At best, other courts, albeit in the context of applying a prior version

10

of the Guidelines,[2] have recognized that loss may be calculated in a variety of ways, including those proposed by both Mr. Sutton and the government. Compare United States v. Sparks, No. 95-60252, 1996 WL 255039, *4 & n.5 (5th Cir. Apr. 18, 1996) (unpublished) (affirming district court's decision to calculate loss using vehicle pricing guide), United States v. Whitlow, 979 F.2d 1008, 1012 (5th Cir. 1992) (affirming district court's decision to measure loss using NADA guide), and United States v. Alborz, 818 F. Supp. 1306, 1309 (N.D. Cal. 1993) (suggesting a variety of methods to calculate loss including using "widely used valuation services or reports") with United States v. Gaitin, No. 98-10129, 1999 WL 459538, *1 (9th Cir. Jul. 2, 1999) (unpublished) (finding district court not bound by defendant's sales records; district court properly relied upon FBI agent, independent study on odometer fraud and industry bulletin to value loss), United States v. Fraaza, No. 97-3863, 1998 WL 122159, * 2 (7th Cir. Mar. 12, 1998) (unpublished) (affirming district court's 50% estimated loss calculation based upon Department of Transportation study), and United States v. Alami, No. 97-4024, 1997 WL 570867, *1-*2 (4th Cir. Sept. 16, 1997) (unpublished) (affirming district court's decision that rejected defendant's reliance on NADA guide because car with rolled-back odometer had lower resale or trade-in value than

---

[2] Prior to 2001, the loss in criminal odometer tampering cases involving more than one vehicle was determined under U.S.S.G. § 2F1.1. In 2001, Amendment 617 consolidated § 2F1.1 into § 2B1.1.

11

unaltered high-mileage car).[3]  These decisions demonstrate that there is simply more than one permissible way to measure loss in criminal odometer tampering cases and that district court's estimate in this case is one such permissible measure.  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Anderson, 470 U.S. at 573.

AFFIRMED.

---

[3]  Mr. Sutton also relies on a number of civil odometer tampering cases that involved calculating damages under 49 U.S.C. §§ 32709(a), 32710(a).  As none of these cases involved estimating loss under the Guidelines, they are irrelevant to this case.